**Monica Goracke**
OSB #06065
mgoracke@oregonlawcenter.org
**Ed Johnson**
OSB #96573
ejohnson@oregonlawcenter.org
**Spencer M. Neal**
OSB #77286
mneal@oregonlawcenter.org
**OREGON LAW CENTER**
921 SW Washington #516
Portland, OR 97205
Phone (503) 295-2760
Fax (503) 295-0676
Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **MARLIN ANDERSON, MARY BAILEY, MATTHEW CHASE, JACK GOLDEN,** on behalf of themselves and all others similarly situated, Plaintiffs,<br><br>vs.<br><br>**CITY OF PORTLAND**; CITY OF PORTLAND POLICE CHIEF **ROSANNE SIZER,** in her individual and official capacity; CITY OF PORTLAND POLICE OFFICER **J. HURLEY,** in his individual and official capacity; CITY OF PORTLAND POLICE OFFICER **J. FULITANO,** in his individual and official capacity; CITY OF PORTLAND **POLICE OFFICERS DOES 1 through 50,** Defendants. | Case No.: 08-1447 AA<br><br>PLAINTIFFS' RESPONSE TO DEFENDANTS' FRCP 12(B)(6) MOTION TO DISMISS |

# TABLE OF CONTENTS

Introduction...........................................................................................................1

Motion to Dismiss Standard...................................................................................1

Factual Background..............................................................................................2

Argument............................................................................................................6

I. Cruel And Unusual Punishment Under The Eighth Amendment................................6

    A. The Punishment At Issue In This Case Is Not Outside The Criminal Process.........6

    B. PCC 14A.50.050, The Erecting Temporary Structures Ordinance, Is A Crime.......11

    C. Plaintiffs' Homelessness Is Involuntary And Their Eighth Amendment Claim Is Not
       Barred By *Robinson* or *Powell*......................................................................13

II. Rights To Movement And Freedom Of Travel Under The Fourteenth Amendment...........16

    A. The Rights To Intrastate Travel And Freedom of Movement Are Inextricable From
       The Right To Interstate Travel.........................................................................16

    B. Cases Regarding Facial Challenges Are Inapplicable To Plaintiffs' As-Applied
       Rights To Travel And Movement Claims............................................................19

III. Fourteenth Amendment Equal Protection Claim.....................................................23

IV. Liberty Interest And Due Process Under The Fourteenth Amendment.......................24

V. Justiciable Controversy Or Political Question.........................................................26

Conclusion..........................................................................................................27

# TABLE OF AUTHORITIES

## Cases

*Baker v. Carr*, 369 U.S. 186 (1962) .................................................................................................30

*Barron v. Reich*, 13 F.3d 1370 (9th Cir. 1994)...............................................................................15

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)......................................................................1

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973);..............................................................................23

*City of Chicago v. Morales*, 527 U.S. 41 (1999) ......................................................................19, 21

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ..........................................................................13

*Conley v. Gibson*, 355 U.S. 41 (1957)...............................................................................................2

*Honig v. Doe*, 484 U.S. 305 (1988)..................................................................................................11

*Ingraham v. Wright*, 430 U.S. 651 (1977)...................................................................................8, 14

*Joel v. City of Orlando*, 232 F.3d 1353 (11th Cir. 2000).................................................15, 16, 28

*Johnson v. Board of Police Commissioners*, 351 F.Supp.2d 929 (E.D.Mo. 2004)....................26, 27

*Johnson v. City of Cincinnati*, 119 F.Supp.2d 735 (S.D.Ohio 2000)...........................................29

*Johnson v. City of Dallas*, 61 F.3d 442 (5th Cir. 1995).................................................................8, 16

*Jones v. City of Los Angeles*, 444 F.3d 1118 (9th Cir. 2006), *vacated, dismissed and remanded*, 505 F.3d 1006 (9th Cir. 2007) ............................................................................................................................passim

*Joyce v. City and County of San Francisco*, 846 F.Supp. 843 (N.D.Cal. 1994)....................16, 23, 24

*Kent v. Dulles*, 357 U.S. 116 (1958)...........................................................................................19, 29

*King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646 (2nd Cir. 1971)......................................20

*Kolender v. Lawson*, 461 U.S. 352 (1983) ......................................................................................19

*League of United Latin American Citizens v. Wilson*, 131 F.3d 1297 (9th Cir. 1997) ...................7

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001)..................................................................2

*Litchfield v. Spielberg*, 736 F.2d 1352 (9th Cir. 1984), *cert. denied*, 470 U.S. 1052 (1985)........2

*McKenzie v. Day*, 57 F.3d 1461 (9th Cir. 1995)................................................................................7

*Nunez by Nunez v. City of San Diego*, 114 F.3d 935 (9th Cir. 1997) ......................................20, 21

*Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972)............................................................20

*Potter v. Biggs*, 2008 U.S. Dist. LEXIS 17399 (D.Or. 2008)......................................................1, 2

*Pottinger v. City of Miami*, 810 F.Supp. 1551 (S.D.Fla. 1992) ................................................passim

*Powell v. Texas*, 392 U.S. 514 (1968) .......................................................................................16, 17

*Robinson v. California*, 370 U.S. 660 (1962)............................................................................16, 17

*Roe v. Anderson*, 134 F.3d 1400 (9th Cir. 1998)..............................................................................7

*Rosen v. Walters*, 719 F.2d 1422 (9th Cir. 1983) .............................................................................2

*Roulette v. City of Seattle*, 850 F.Supp. 1442 (W.D.Wash. 1994).................................................24

*Roulette v. City of Seattle*, 97 F.3d 300 (9th Cir. 1996).............................................................24, 27

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) ..........................................................................................2

*State of Ohio v. Burnett*, 93 Ohio St. 3d 419 (2001) ...............................................................19, 20

*Streetwatch v. National R.R. Passenger Corp.*, 875 F.Supp. 1055 (S.D.N.Y. 1995) ....................28

*Tobe v. City of Santa Ana*, 9 Cal.4th 1069 (Cal. 1995) ...........................................................22, 23, 24

*Turner v. Hallberg*, 2005 U.S. Dist. LEXIS 37184 (D.Or. 2005) ................................................30

*United States v. Wheeler*, 254 U.S. 281 (1920).........................................................................20, 21

*William v. Fears*, 179 U.S. 270 (1900)............................................................................................19

*Yeakle v. City of Portland*, 322 F.Supp.2d 1119 (D.Or. 2004) .....................................................29

## Statutes

Fed. R. Civ. P. 12(b)(6) ........................................................................................................................1

## INTRODUCTION

Homeless individuals in the City of Portland have faced citation, arrest, and punishment, and are imminently at risk of further citation, arrest, and punishment, on the basis of life-sustaining conduct that they have been compelled by poverty (and in many cases disability) to perform in public places. The city ordinances at issue in this case, which prohibit "camping" and "erecting temporary structures," are far more restrictive and punitive than they may initially appear. In fact, they both apply to and have been enforced against Plaintiffs and similarly situated homeless individuals who are simply sleeping or lying down in a public place with "any sleeping matter" or who have placed on public property a shopping cart or bicycle trailer full of belongings covered by a tarp. These ordinances are being deployed strategically to target and harass homeless people. They apply at all hours of the day and everywhere in Portland. They are used to arrest, fine, exclude and sanction people who have nowhere else to take care of their basic human needs or to keep their few belongings. There is strong legal support for the argument that the application of these ordinances to Plaintiffs and similarly situated individuals violates their basic constitutional rights under the Eighth and Fourteenth Amendments.

## MOTION TO DISMISS STANDARD

"Under Fed. R. Civ. P. 12(b)(6), once a claim has been stated adequately, it may be supported by 'showing any set of facts consistent with the allegations in the complaint.'" *Potter v. Biggs*, 2008 U.S. Dist. LEXIS 17399 (D.Or. 2008), *citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Litchfield v. Spielberg*, 736 F.2d 1352, 1357 (9th Cir. 1984), *cert. denied*, 470 U.S. 1052 (1985). "For the purpose of the motion to dismiss, the complaint is liberally construed in favor of the plaintiffs, and its allegations are taken as true." *Potter*, 2008 U.S. Dist. LEXIS 17399 at *1, *citing Rosen v. Walters*, 719 F.2d 1422, 1424 (9th Cir. 1983). A court

should not grant a motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Factual challenges to the plaintiffs' claims have no bearing on the legal sufficiency of allegations under Rule 12(b)(6). *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). The issue in a motion to dismiss is not "whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

## FACTUAL BACKGROUND

Under Portland City Code (hereafter "PCC") 14A.50.020, it is unlawful "to set up, or to remain in or at a campsite, for the purpose of establishing or maintaining a temporary place to live." A "campsite" is defined in the ordinance as "any place where any bedding, sleeping bag, or other sleeping matter, or any stove or fire is placed, established, or maintained, whether or not such place incorporates the use of any tent, lean-to, shack, or any other structure, or any vehicle or part thereof." On its face, this ordinance does not necessarily appear to prohibit life-sustaining conduct; however, Plaintiffs' Complaint explains that Portland Police Bureau officers are currently enforcing PCC 14A.50.020 to prohibit sleeping or lying on public property at all times of the day and night if the person has anything that could be interpreted as "bedding material" (e.g. a sleeping bag, a backpack, or a piece of cardboard underneath them). For this reason, Plaintiffs allege that the enforcement of this ordinance effectively prohibits them from sleeping anywhere in the City of Portland.

Plaintiffs' need to sleep outside is not, as Defendants argue, a voluntary choice: it is a necessity in an environment where hundreds of homeless people are turned away from shelters every night and the lack of shelter and housing is well-documented, as will be discussed further

below. Further details of the enforcement of PCC 14A.50.020 are listed in the Complaint at ¶¶ 27-28, 30, 34-35, as well as in the facts concerning each individual Plaintiff (*see* Complaint, ¶¶ 10-12, 14, 18, 20-21).

Under PCC 14A.50.050, it is unlawful to erect, install, place, leave, or set up any type of permanent or temporary fixture or structure of any material(s) in or upon non-park public property or public right-of-way without a permit or other authorization from the City. Portland police officers frequently enforce this law against homeless individuals who have put up tents or even simply gathered their belongings together, often without providing 24 hours notice as required by state law. Complaint, ¶ 29. It is the policy and practice of officers to wake homeless campers up, tell them to move, and/or give them park exclusions and/or citations for violating the camping ordinance, erecting temporary structures, or trespassing. Officers have also undertaken a systematic effort to institute "trespass agreements" allowing them to remove sleeping people from doorways and other private property in downtown areas. Fences have been erected to barricade areas under bridges and overpasses where people sought shelter from the elements to sleep. *See* Complaint, ¶¶ 29, 34-35. The policies and practices of the Portland Police in enforcing both PCC 14A.50.020 and PCC 14A.50.050 make it difficult if not impossible to be homeless in Portland without breaking the law. *Id.* Plaintiffs' challenge to these policies and practices (and to both ordinances) is an as-applied, not facial, challenge.

Plaintiffs' Complaint contains detailed and specific allegations about each individual plaintiff and their individual circumstances, including the reasons for their homelessness and the actions taken against them by police. *See* Complaint, ¶¶ 8-25. None of the Plaintiffs "choose" to be homeless; all allege in the Complaint that their homelessness is involuntary.

The Complaint also alleges with specificity that there is insufficient shelter space and affordable housing for homeless persons in Portland. According to a street count of persons sleeping outside conducted in 2007 by the City of Portland, 1,438 "unduplicated" persons slept outside in Portland on January 24, 2007. Complaint, ¶ 31. This count was conducted under stringent criteria, and the City acknowledges that it was probably an under-count. *Id.*

While more recent street count data is not yet available, the City reported for a 2008 nationwide survey that "there has been an increase in the number of homeless persons, including families, in greater Portland. This includes an almost 22 percent increase in the number of employed homeless persons." *See* Exhibit 1, selected pages from The United States Conference of Mayors, *Hunger and Homelessness Survey: A Status Report on Hunger and Homelessness in America's Cities: A 25-City Survey*, Dec. 12, 2008, p. 42 (full report available online at http://usmayors.org/pressreleases/documents/hungerhomelessnessreport_121208.pdf). The specific increase in the number of homeless people in Portland was 33%. *Id.* at 71. For the same survey, Portland reported that 2,994 persons accessed emergency shelters at some point over the past year (with larger numbers of homeless persons in transitional and permanent supportive housing). *Id.* at 69. Portland also reported that it had 890 emergency shelter beds available, and that on "an average night" 674 persons were staying in emergency shelter. *Id.*

With at least 1,438 persons sleeping outside on an average night, it is reasonable to infer that not every homeless person will go to a shelter and ask for a bed on a given night if they have been turned away in the past. It is well-known on the streets in Portland that there are not enough shelter beds for everyone who wants one.

Moreover, during recent severe-weather events in late December 2008 and January 2009, the City of Portland opened additional emergency shelters, including additional funding for

private shelters to increase their capacity. During this time period, Portland's shelters were full or close to full, demonstrating that the need is severe, that homeless individuals do seek shelter when it is available, and that the City can meet the need when it chooses to. *See* Exhibit 2, Peter Korn, *City Homeless Agencies Weather Historic Storm*, Portland Tribune, January 8, 2009. This article also reports that "on many winter nights, more than 500 homeless people are turned away from Portland's overflowing shelters." *Id.*

The rapid deterioration of economic conditions in the months since this case was filed only provides stronger support for the allegations that involuntarily homeless people are being and will continue to be forced to violate the law by sleeping in public places. Plaintiffs believe they will be able to show that homelessness in Portland has risen substantially as more and more people are unable to find work or housing, and that government assistance is simply unavailable to many in this situation.

Homeless residents of Portland are not living a carefree life of irresponsible luxury or depravity. As Plaintiffs and other class members will testify, the only "choice" as evening approaches is whether to stand in a homeless shelter's line hoping that a bed will open up for the night, knowing that on foot or by bus you probably can't get to the next shelter before its beds fill up too, or to seek shelter from the elements on some out-of-the-way corner of public or private property, knowing that you are breaking the law and risking citation or arrest at any moment. Humans need to sleep. The premise of making an unwanted behavior illegal is that individuals have the choice not to engage in that behavior. The City of Portland has left Plaintiffs and other similarly situated individuals no choice but to break the law, simply because they are homeless.

## ARGUMENT

I.    **Cruel And Unusual Punishment Under The Eighth Amendment**

A.    The Punishment At Issue In This Case Is Not Outside The Criminal Process.

Defendants' motion to dismiss this case argues that Plaintiffs fail to state a claim for violation of the Eighth Amendment because they do not allege that they have been convicted under the ordinances at issue. While it is true that none of the named Plaintiffs has yet been convicted under the anti-camping ordinance (further discussion of Plaintiff Anderson's prosecution under this ordinance is below), Plaintiffs Chase and Golden have in fact been convicted of violating the temporary structures ordinance. Chase was convicted at least twice in July 2008 and September 2008. *See* Exhibit 3, Case Nos. 080951980 & 080545582, Oregon Judicial Information Network (OJIN) report for Matthew Chase, last accessed 3/18/09. Golden was convicted at least once in July 2008. *See* Exhibit 4, Case No. 080545581, OJIN report for Jack Golden, last accessed 3/18/09.

The question of whether Eighth Amendment standing requires a showing of conviction was considered by a Ninth Circuit panel in *Jones v. City of Los Angeles*, 444 F.3d 1118 (9th Cir. 2006), *vacated, dismissed and remanded*, 505 F.3d 1006 (9th Cir. 2007). The Ninth Circuit vacated this decision (and dismissed the appeal as moot and remanded to the district court) at the parties' joint request as part of a global settlement, and for this reason Plaintiffs may not and do not cite the decision as controlling authority for this Court. *League of United Latin American Citizens v. Wilson*, 131 F.3d 1297, 1305, fn. 5 (9th Cir. 1997); *McKenzie v. Day*, 57 F.3d 1461, 1465 (9th Cir. 1995). However, its reasoning may be considered useful or even persuasive to this Court. *Roe v. Anderson*, 134 F.3d 1400, 1404 (9th Cir. 1998); see *McKenzie v. Day*, 57 F.3d at 1466 (panel adopted vacated opinion's analysis as its own).

In *Jones*, the Ninth Circuit considered the constitutionality of a Los Angeles ordinance prohibiting sitting, lying or sleeping in a public way at any hour of day everywhere in the city. 444 F.3d at 1123. The City of Los Angeles argued on appeal that plaintiffs, six homeless individuals, lacked standing under the Eighth Amendment because they had not been convicted under the ordinance. *Id.* at 1126. For legal support, Los Angeles relied on the identical cases cited by Defendants here in their motion to dismiss this case: *Ingraham v. Wright*, 430 U.S. 651, 667 (1977) and *Johnson v. City of Dallas*, 61 F.3d 442 (5th Cir. 1995). But as the Ninth Circuit pointed out in *Jones*, the *Ingraham* decision addressed whether the Eighth Amendment applied to the use of disciplinary corporal punishment in public schools: "*Ingraham* rests on the distinction between state action inside and 'outside the criminal process,' *id.* at 667, not on any distinction between criminal convictions and preconviction law enforcement measures such as arrest, jailing, and prosecution." *Jones*, 444 F.3d at 1128.

The very language from *Ingraham* relied on by the City of Portland here – "[the Cruel and Unusual Punishments Clause] was designed to protect those convicted of crimes, *id.* at 664" – is, as *Jones* states, "relevant only to the first two of the three circumscriptions on the criminal process identified by the *Ingraham* Court: limits on the kind and proportionality of punishment permissible postconviction. That language is inapplicable when the challenge is based on the third category of limitations, 'on what can be made criminal and punished as such.' *Id.* at 667." *Jones*, 444 F.3d at 1128.

The *Jones* panel further discussed why conviction should not be "a prerequisite for any type of Cruel and Unusual Punishment Clause challenge": the reason is that doing so

> would allow the state to criminalize a protected behavior or condition and cite, arrest, jail, and even prosecute individuals for violations, so long as no conviction resulted. Under this approach, the state could in effect punish individuals in the preconviction stages of the criminal law enforcement process for being or doing

> things that under the Clause cannot be subject to the criminal process. But the
> Clause's third protection limits the state's ability to criminalize certain behaviors
> or conditions, not merely its ability to convict and then punish post-conviction.

*Jones*, 444 F.3d at 1129.

Ironically, the Ninth Circuit's hypothetical describes the status quo in the City of

Portland, which is currently enforcing PCC 14A.50.020 and 14A.50.050 against homeless

people, both before, during, and after conviction. For example, Plaintiff Marlin Anderson was

cited for violating the anti-camping ordinance as he lay taking a nap on top of a sleeping bag in a

grassy area on a hot summer day. Complaint, ¶¶ 9-11. He had previously been warned by police

not to "camp" there. *Id.* When he pled not guilty, he was given a court date for trial. A few

days before trial he retained counsel (the same as in this case), who notified the District

Attorney's Office that Anderson would be represented by counsel at trial. The District Attorney

promptly notified Anderson's lawyer that it was dismissing the case. Complaint, ¶ 12. The

District Attorney gave no explanation for its dismissal, but presumably it was not because the

City had suddenly decided its ordinance was unconstitutional. However, as Anderson's

experience shows, the City is willing to and does in fact use the criminal process against

individuals who have allegedly violated the ordinance. Every Plaintiff in this case has alleged

that he or she has been warned or "moved along" by police who use the anti-camping ordinance

as a law enforcement tool. Complaint, ¶¶ 10, 14, 18, 20, 21.

If this Court holds that conviction is required for Plaintiffs to make an as-applied

challenge under the Eighth Amendment, Plaintiffs respectfully request in the alternative that they

be allowed to conduct discovery to determine which individuals in the alleged class have been

convicted under the anti-camping ordinance, and thus to determine whether any are willing and

able to serve as named Plaintiffs in this case. Part of the difficulty in locating individuals with

camping convictions is that Defendants are going to great lengths to enforce this ordinance, through warnings, "moving along," park exclusions, and the community court process while avoiding actual convictions. Defendants' practice when issuing citations under PCC 14A.50.020 and 14A.50.050 is to require cited individuals to appear in community court, where the court or district attorney almost always reduces their misdemeanor charge to a violation, which means they are not entitled to any lawyer. Community court is essentially a diversion program; a defendant may perform eight hours of community service and in return the citation is discharged and no conviction results. While part of the rationale for this process is to help individuals avoid convictions, the imposition of community service is still a form of punishment. Homeless people who have nowhere else to sleep or to store their belongings, and are cited for violating these ordinances, are either forced to pay fines they cannot afford or to do eight-hour community service sentences over and over.

Moreover, as the Complaint alleges, if homeless individuals are found sleeping in a public park, they are often given a park exclusion for up to 180 days. Complaint, ¶¶ 30, 34. If they re-enter that park during the exclusion period, they can be cited for criminal trespass. A park exclusion goes into effect immediately and does not require an actual citation for camping; this is another way the City punishes individuals while avoiding convicting them under the anti-camping ordinance.

Just as *Jones* envisions, the City is in fact using both of these ordinances to punish and target homeless individuals, and it is able to do so even without convictions by warning them, telling them to move along, destroying their property, excluding them from public parks, and keeping them in fear of citation and arrest. For example, Plaintiffs Bailey and Chase and other homeless individuals have had property taken or destroyed, or have been threatened with

property removal or destruction, even when they have not received actual citations or convictions under this ordinance. Complaint, ¶¶ 23-25, 29. In short, these ordinances are a law enforcement tool and thus subject to challenge under the Eighth Amendment's third limitation on what can be made criminal.

Finally, Defendants ignore the Complaint's allegations that Plaintiffs and other similarly situated individuals are likely to be moved along, excluded from parks, cited, prosecuted and/or convicted under the ordinance in the future. Complaint, ¶¶ 36-39. For example,

> With respect to the plaintiffs and the class they represent, at the time of their citations and encounters with police ordering them to "move along," they were not committing any crime except "camping," that is, sleeping outside with survival gear such as blankets or a sleeping bag, a tent, or other belongings. Plaintiffs were and are involuntarily homeless, with no available shelter or lodging accommodations. They intend to and must sleep or lodge outside in public without shelter. They have been and/or will be in the future cited, criminally charged, and arbitrarily moved from place to place. Complaint, ¶ 37.

To state a claim for injunctive relief, "[t]he plaintiff need only establish that there is a reasonable expectation that his conduct will recur, triggering the alleged harm; he need not show that such recurrence is probable." *Jones*, 444 F.3d at 1127, citing *Honig v. Doe*, 484 U.S. 305, 318 (1988). Because they have nowhere else to live and must sleep somewhere, Plaintiffs will be able to establish not only that recurrence is reasonably likely but probable as well. Using the *Jones* panel's analysis, similar allegations (in conjunction with evidence of the "enormous gap" between the number of available beds and the number of homeless individuals in a city) are sufficient for Eighth Amendment standing. *Id.* (holding that "[a]ppellants have demonstrated both past injuries and a real and immediate threat of future injury: namely, they have been and are likely to be fined, arrested, incarcerated, prosecuted, and/or convicted for involuntarily violating section 41.18(d) at night in Skid Row.")

There are two differences between the posture of *Jones* and this case which should be discussed. The *Jones* plaintiffs sought only prospective injunctive relief, not damages, and were not claiming that the ordinance was facially unconstitutional, only that its enforcement should be enjoined in a small area of the city during nighttime hours. *Id.* The Complaint in this case also seeks prospective injunctive relief, but it does ask for damages according to proof. Since it is still early in the lawsuit and no discovery has commenced, Plaintiffs' claim for damages is still subject to evidence adduced during discovery. Also, at this early stage, the Complaint does not ask for specific relief beyond suspending the ordinance. Most importantly, however, just as in *Jones*, the claim here is not that the ordinances are facially unconstitutional. Rather, Plaintiffs argue that the ordinances are unconstitutional as applied to a defined class of homeless people who are or will be cited or excluded. *See, e.g.*, Complaint, ¶¶ 41, 43.

B.    PCC 14A.50.050, The Erecting Temporary Structures Ordinance, Is A Crime

Finally, Plaintiffs do not understand Defendants' claims that PCC 14A.50.050 should be considered a violation rather than a crime and that it provides only for abatement of the structure rather than a fine or jail time. There is no limitation in PCC 14A.50.050 to abatement as the only remedy, and in fact, Section B of the ordinance states in part, "*In addition to other remedies provided by law*...the obstruction may be abated..." Exhibit 5, PCC 14A.50.050, last accessed 3/24/09 (emphasis added).   In the section of the Portland City Code denoted "Procedures," PCC 14A.20.060 states, "Unless a different penalty is specifically provided, any violation of any provision of this Title shall upon conviction be punished by a fine of not more than $500, or by imprisonment of not more than 6 months, or by both. However, no greater penalty shall be imposed than allowed under Oregon law." Exhibit 6, PCC 14A.20.060, last accessed 3/24/09.

In fact, this ordinance is a misdemeanor and is charged as such, with fines imposed for conviction. The OJIN reports for Plaintiffs Chase and Golden's PCC 14A.50.050 charges show that this offense is classified as a misdemeanor and that it was "reduced by court elective." *See* Exhibits 3 and 4, *supra*. They also show fines of $75, $100 and $100 for each offense. *Id.*

Even if this offense were classified as a violation rather than a crime, it should not be exempted from the analysis or conclusion of the *Jones* panel. Specifically, the panel concluded that "to bring an as-applied challenge to a criminal statute alleged to transgress the Clause's substantive limits on criminalization, all that is required for standing is some direct injury – for example, a deprivation of property, such as a fine, or a deprivation of liberty, such as an arrest – resulting from the plaintiff's subjection to the criminal process due to violating the statute. *Jones*, 444 F.3d at 1129, citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983).

PCC 14A.50.050 is a criminal statute for the purpose of this as-applied challenge because police enforce it, police have the power to command an individual to come to court, and if an individual does not appear in court, he or she is subject to fines and arrest for failure to appear. It is not a civil statute nor is it outside the criminal process in the same way that deportation of aliens and physical discipline in schools are. Moreover, the Supreme Court noted in *Ingraham* that "[s]ome punishments, though not labeled 'criminal' by the State, may be sufficiently analogous to criminal punishments in the circumstances in which they are administered to justify application of the Eighth Amendment." *Ingraham*, 430 U.S. at 669, n. 37.

Furthermore, when this ordinance is enforced against homeless people, a deprivation of property is guaranteed, because as applied to homeless people the "abatement" of the structure means summarily destroying what little personal property a homeless person is able to maintain. For Plaintiffs Bailey and Chase, property that was destroyed by police included tents, clothing,

and irreplaceable personal items. Complaint, ¶ 25. Evidence in this case will show that other

homeless individuals have lost medication, eyeglasses, and essential paperwork such as drivers'

licenses, identification cards and birth certificates, as a result of the "abatement" of such

"temporary structures."

C.    Plaintiffs' Homelessness Is Involuntary And Their Eighth Amendment Claim Is
      Not Barred By *Robinson* or *Powell.*

Defendants' motion to dismiss also relies on arguments that were rejected by the Ninth

Circuit panel in *Jones* about the categorization of homelessness as a voluntary behavior rather

than a condition or status, and for similar reasons, Plaintiffs urge this Court to reject the City's

arguments as well. In addition, finding that homelessness is a status for purposes of Eighth

Amendment standing does not represent a slide down the slippery slope of social policymaking,

as Defendants argue in their motion.

First, Defendants' attempt to characterize Plaintiffs' homelessness as the result of

voluntary choices is not supported by the facts as alleged in this Complaint. As described above

in the "Background" section of this response, each Plaintiff alleges that his or her homelessness

is involuntary, and that shelter or lodging is not available to them. *See* Complaint, ¶¶ 8-25, 37.

While the Complaint explains that these individual Plaintiffs sleep outside because they are

unable to access shelters or find affordable housing for a variety of reasons mostly related to

disability and poverty, these reasons are secondary to a more basic fact: there is a severe lack of

shelter space and affordable housing in Portland, and the Complaint clearly alleges this fact. *See*

Complaint, ¶¶ 31-33. Even if these individual Plaintiffs had no other barriers to entering shelter,

they still would be homeless in Portland because on many if not most nights, there is nowhere for

them to go. This situation has only worsened in the months since this lawsuit was filed.

To the extent Defendants have raised doubt about the reasons Plaintiffs are sleeping outside, this doubt should be resolved in Plaintiffs' favor on a motion to dismiss. *Barron v. Reich*, 13 F.3d 1370, 1374 (9th Cir. 1994) (citations omitted). Plaintiffs' allegations that their homelessness is involuntary and that there is a severe lack of shelter are sufficient at this stage.

Moreover, Defendants do not and cannot make any showing that there is sufficient shelter space in Portland for all homeless individuals who need it. Plaintiffs' information about the lack of shelter space and affordable housing comes directly from the City of Portland's publications and surveys. Defendants' reliance on *Joel v. City of Orlando*, 232 F.3d 1353 (11th Cir. 2000), is therefore misplaced. As in *Pottinger v. City of Miami*, 810 F.Supp. 1551 (S.D.Fla. 1992) and *Jones v. City of Los Angeles, supra,* Plaintiffs here have alleged and the evidence in this case will show a severe lack of shelter and housing in Portland. Plaintiffs do not claim that the City's ordinances punish a status on their face, but rather that the City's application of the ordinances, including the policies and practices described in the Complaint, to involuntarily homeless people criminalizes the status of homelessness. The Eleventh Circuit in *Joel* conceded that as long as homeless people had no other place to go, they could not be prevented from sleeping in public. 232 F.3d at 1362, citing *Pottinger* and *Johnson v. City of Dallas*, 860 F.Supp. 344, 350 (N.D.Tex.1994), *rev'd on other grounds*, 61 F.3d 442 (5th Cir. 1995).

The rest of Defendants' argument with regard to Plaintiffs' Eighth Amendment claim relies on *Joyce v. City and County of San Francisco*, 846 F.Supp. 843 (N.D.Cal. 1994), an inapposite case both legally and factually. First, the district court in *Joyce* was asked to issue a preliminary injunction against a substantial part of a comprehensive homelessness program, not to resolve a motion to dismiss. *Joyce*, 846 F.Supp. at 851-53. Second, the holding of *Joyce* that homelessness is not a status under *Robinson v. California*, 370 U.S. 660 (1962), and *Powell v.*

*Texas*, 392 U.S. 514 (1968) was criticized by the Ninth Circuit in *Jones v. City of Los Angeles* for reasons that should be persuasive here.

In *Jones,* the Ninth Circuit explained that *Robinson* and *Powell* should not be read to compel the conclusion that "the only relevant inquiry is whether the ordinance at issue punishes status as opposed to conduct, and that homelessness is not a constitutionally cognizable status." *Jones,* 444 F.3d at 1131. Rather, the line between conduct and status is not so easily drawn, since "one could define many acts as being in the condition of engaging in those acts, for example, the act of sleeping on the sidewalk is indistinguishable from the condition of being asleep on the sidewalk." *Id.* at 1135. The panel also found support in *Powell* (from agreement between Justice White's concurrence and four other justices' dissent) for "the proposition that the Eighth Amendment prohibits the State from punishing an involuntary act or condition if it is the unavoidable consequence of one's status or being." *Id.*, citing *Powell,* 392 U.S. at 548, 550 n.2, 551. Thus, the panel said, "there are two considerations relevant to defining the Cruel and Unusual Punishment Clause's limits on the state's power to criminalize. The first is the distinction between pure status – the state of being – and pure conduct – the act of doing. The second is the distinction between an involuntary act or condition and a voluntary one." *Id.* at 1136. Applying this legal analysis to the situation in Los Angeles – that the ordinance was being enforced "at all times and in all places against homeless individuals who are sitting, lying, or sleeping in Los Angeles's Skid Row because they cannot obtain shelter" – the Ninth Circuit found an Eighth Amendment violation. *Id.*

Plaintiffs here seek an opportunity to demonstrate that given the situation in Portland, they and others similarly situated are also being punished for involuntary acts in violation of the Eighth Amendment. The fact that homelessness for a given individual is a product of both

voluntary and involuntary acts or choices, and "that [homeless individuals] may obtain shelter on some nights and may eventually escape from homelessness does not render their status at the time of arrest any less worthy of protection than a drug addict's or an alcoholic's." *Jones*, 444 F.3d at 1137. Like Los Angeles, Portland has criminalized acts that are an integral aspect of an involuntary condition, that is, involuntary homelessness. If a person has nowhere to live but outside, punishing them for being at a place where any sleeping matter is maintained, as the anti-camping ordinance does, essentially makes it illegal to sleep. Humans need to sleep, and they need minimal survival gear to protect themselves from cold, rain, snow and wind. Plaintiffs ask Defendants a basic question: If a citizen of Portland has no home, no money, and no shelter bed is available for them, how can they sleep at night without violating the law? Where are they supposed to go?

**II.    Rights To Movement And Freedom Of Travel Under The Fourteenth Amendment**

   A.    The Rights To Intrastate Travel And Freedom of Movement Are Inextricable
          From The Right To Interstate Travel.

   Plaintiffs' Complaint alleges that the rights to travel and movement protected under the Fourteenth Amendment include the freedom to move about and be in one place for innocent purposes. Complaint, ¶ 49. These rights are not as narrowly defined as Defendants' motion argues. The fact that PCC 14A.50.020 and 050 do not facially distinguish between residents and non-residents or contain residency requirements does not bar Plaintiffs' claim.

   While the U.S. Supreme Court has never had occasion to decide the question of whether there exists a fundamental right to intrastate travel, as articulated by the Ohio Supreme Court, "recognizing a right of intrastate travel is hardly groundbreaking. Much like the right to interstate travel, the right to intrastate travel has a long, historical recognition in the conscience and traditions of our people." *State of Ohio v. Burnett*, 93 Ohio St. 3d 419, 428 (2001). A long

16  PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS

line of Supreme Court precedent has suggested that such a right is a necessary corollary to the well established right of interstate travel. *See William v. Fears*, 179 U.S. 270 (1900) (right of "free transit from or through the territory of any state is a right secured by the Fourteenth Amendment"); *Kent v. Dulles*, 357 U.S. 116, 125-26 (1958) ("freedom of movement . . . inside frontiers as well . . . is basic in our scheme of values"); *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (freedom of movement includes right to travel freely along city streets); *City of Chicago v. Morales*, 527 U.S. 41, 53-54, 60 (1999) (plurality recognizes freedom to loiter for innocent purposes is a fundamental liberty interest protected by the Fourteenth Amendment). As the Second Circuit explained in recognizing a fundamental right to intrastate travel, "it would be meaningless to describe the right to travel between states as a fundamental precept of personal liberty and not to acknowledge a correlative right to travel within a state." *King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646, 648 (2nd Cir. 1971). And as the Ohio Supreme Court concluded,

> [i]n its most specific, careful description, the right of intrastate travel we contemplate is the right to travel locally through public spaces and roadways of this state. . . . Every citizen of this state, much like the citizens of this Nation, enjoys the freedom of mobility not only to cross our borders into our sister states, but also to roam about innocently in the wide-open spaces of our state parks or through the streets and sidewalks of our most populous cities. This freedom of mobility is a tradition extending back to when the first settler crossed into what would eventually become this great state, and it is a tradition no Ohioan would freely relinquish.

*State of Ohio v. Burnett*, 93 Ohio St. 3d at 428.

In *Nunez by Nunez v. City of San Diego*, 114 F.3d 935, 944 (9th Cir. 1997), the Ninth Circuit held, "Citizens have a fundamental right of free movement, 'historically part of the amenities of life as we have known them.'" *Id.*, citing *Papachristou v. City of Jacksonville*, 405 U.S. 156, 164 (1972); and *United States v. Wheeler*, 254 U.S. 281, 293 (1920) ("In all the states

from the beginning down to the adoption of the Articles of Confederation the citizens thereof possessed the fundamental right, inherent in citizens of all free governments, peacefully to dwell within the limits of their respective states, to move at will from place to place therein, and to have free ingress thereto and egress therefrom . . . ."). The Ninth Circuit then suggests without deciding that a fundamental right to intrastate travel may exist as a corollary to interstate travel, and notes the even split in Circuits on this question. *Id.* at 944.

Defendants' enforcement of PCC 14A.50.020 and 14A.50.050, in conjunction with their other policies and practices described in the Complaint, substantially burdens the fundamental right to travel and freedom of movement of homeless people who live outside in Portland and are threatened with citation, arrest, conviction, and property destruction under these ordinances. A person does not have to be in perpetual motion to be deprived of these rights; he or she should be free to merely exist ("peacefully to dwell," *Wheeler, supra*) in a place, and the Complaint alleges a regime in which homeless individuals in Portland are not free to exist if they also need to sleep. As the Supreme Court said in *Morales*, even "the freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment...[and] an individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers." *City of Chicago v. Morales*, 527 U.S. at 60. The facts in this case will show that a person who has no home and who cannot find shelter or affordable housing in Portland cannot lawfully travel to or reside in Portland without breaking the law or risking citation or arrest. Because every individual has a human need to sleep and will need to sleep at some point when they travel to a city, Plaintiffs and other similarly situated homeless people can live here only by violating the law. Thus, a substantial burden is placed on their freedom of movement and to simply be in one place for innocent purposes.

Again, Plaintiffs do not claim they should be free to "camp" or store property at all places or at all times of the day in Portland. Rather, their claim is that by prohibiting homeless individuals from sleeping outside with "any sleeping matter" at all places and times, and by summarily destroying these individuals' personal property, Defendants have deprived Plaintiffs of their constitutional rights.

> B.    Cases Regarding Facial Challenges Are Inapplicable To Plaintiffs' As-Applied Rights To Travel And Movement Claims.

The three cases cited by Defendants as authority for dismissing Plaintiffs' Fourteenth Amendment rights to travel and movement claims should not compel such a conclusion. First, in *Tobe v. City of Santa Ana*, 9 Cal.4th 1069 (Cal. 1995), the California Supreme Court held that Plaintiffs' petitions had not perfected an "as applied" challenge, and the challenged ordinance (prohibiting camping and storing personal property in public) was valid on its face. *Id.* at 1080. For this threshold reason, *Tobe*'s posture is substantially different from that of this case and its holding should not bar Plaintiffs' Fourteenth Amendment claims.

Indeed, as the California Supreme Court "emphasized[,] the procedural posture of a case is not simply a 'technicality.' The procedural posture of a case...determines the ability of the parties to exercise their right to present relevant evidence and to the creation of a full record adequate to enable the reviewing court to make a reasoned decision on the questions before it." *Id.* at 1092 (citations omitted). While this analysis was made in the context of the proper scope of appellate review, the point is relevant here: a facial challenge is distinct from an as-applied challenge in part because of the need for a factual record. This case is not a challenge to the facial validity of PCC 14A.50.020 and 050, and thus the appropriate question is not whether there is any conceivable constitutional application of the laws, but rather whether if all the allegations in the Complaint are taken as true, Plaintiffs have adequately stated a claim that they

are being treated unconstitutionally. *Tobe*'s holding that Santa Ana's ordinance did not facially violate the right to travel should not bar the as-applied challenge in this case.

*Tobe* does contain a helpful analysis of the distinction between facial and as-applied challenges:

> An as applied challenge may seek (1) relief from a specific application of a facially valid statute or ordinance to an individual or class of individuals who are under allegedly impermissible present restraint or disability as a result of the manner or circumstances in which the statute or ordinance has been applied, or (2) an injunction against future application of the statute or ordinance in the allegedly impermissible manner it is shown to have been applied in the past. It contemplates analysis of the facts of a particular case or cases to determine the circumstances in which the statute or ordinance has been applied and to consider whether in those particular circumstances the application deprived the individual to whom it was applied of a protected right.

*Tobe*, 9 Cal.4th at 1084 (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 615-616 (1973); other citations omitted).

As previously stated, the relief sought in *Joyce v. City and County of San Francisco*, 846 F.Supp. 843 (1994) was also sufficiently distinct that its holding should not control here. The district court in *Joyce* was asked to enter a preliminary injunction against San Francisco's homelessness program "insofar as it penalize[d] certain life-sustaining activities." 846 F.Supp. at 846. The preliminary injunction standard is demanding; to grant "relief constitutes an extraordinary use of the Court's powers, and [relief] is to be granted sparingly and with the ultimate aim of preserving the status quo pending trial on the merits." *Id.* at 850.

Finally, like *Tobe*, *Roulette v. City of Seattle*, 850 F.Supp. 1442, 1444-45 (W.D.Wash. 1994), *affirmed*, 97 F.3d 300 (9th Cir. 1996) also presented a facial challenge. In *Roulette*, the district court considered an ordinance that "prohibited a person who has received notice of violation from sitting or lying on a public sidewalk or on any object placed on a public sidewalk between 7 a.m. and 9 p.m. in downtown Seattle and Seattle neighborhood commercial areas."

Numerous exceptions to the ordinance included "circumstances involving medical emergencies; wheelchairs; sidewalk cafes, parades, rallies, demonstrations, performances or meetings for which street use permits have been issued; chairs or benches supplied by a public agency or abutting private property owner; and seats in bus zones occupied by people waiting for the bus." 850 F.Supp. at 1444-45. These limitations and exceptions highlight the unfairness of Portland's current enforcement of its anti-camping and temporary structures ordinances against homeless people with nowhere else to go: the ordinances are enforced at all times of day, everywhere in the city, and without exception for any circumstances, medical or otherwise. *Roulette* noted that "the sidewalk ordinance d[id] not impede migration into commercial areas by making it impossible for individuals to carry out essential activities in those areas," and that it left "open numerous options of places to sit or lie down." *Id.* at 1448. In contrast, Defendants' enforcement of the anti-camping ordinance leaves no option for sleeping open to homeless individuals in Portland who cannot find shelter or housing. Defendants' enforcement of the temporary structures ordinance by summary abatement leaves no option for keeping personal property open to homeless individuals who have nowhere to store it.

Instead of the inapposite holdings of *Tobe, Joyce,* and *Roulette,* Plaintiffs urge this Court to find *Pottinger v. City of Miami,* 810 F.Supp. 1551 (S.D.Fla. 1992) more persuasive. *Pottinger* was an as-applied challenge where plaintiffs and the class they represented were not always charged or convicted with the ordinances that were being enforced against them. 810 F.Supp. at 1553-54. Applying strict scrutiny, *Pottinger* holds that the homeless plaintiffs' fundamental right to travel was violated by a facially neutral ordinance that resulted in a high number of arrests for sleeping in public places, loitering, obstruction of sidewalks, and presence in parks after closing time. *Id.* at 1554. The court held that "preventing homeless individuals from

performing activities that are 'necessities of life,' such as sleeping, in any public place when they

have nowhere else to go effectively penalizes migration." *Id.* at 1580. The court also reasoned,

based on facts almost identical to those alleged here, that

> forcing homeless individuals from sheltered areas or from public parks or streets
> affects a number of 'necessities of life' – for example, it deprives them of a place
> to sleep, of minimal safety and of cover from the elements.
>         In addition to depriving homeless individuals of certain life necessities,
> arresting them for such harmless conduct also acts as a deterrent to their
> movement.... The evidence overwhelmingly shows that plaintiffs have no place
> where they can be without facing the threat of arrest. Given the vast number of
> homeless individuals and the disproportionate lack of shelter space, the plaintiffs
> truly have no place to go. Because they offer no protection from the elements or
> from crime, many of the plaintiffs' choices for alternative shelter–e.g., the space
> under bridges or the streets–cannot be considered reasonable or realistic choices
> at all. Consequently, the enforcement of ordinances, e.g., against being in the park
> after hours or against loitering, effectively bans homeless individuals from all
> public areas and denies them a single place where they can be without violating
> the law. Like the anti-sleeping ordinances, enforcement of the challenged
> ordinances against homeless individuals significantly burdens their freedom of
> movement. It has the effect of preventing homeless people from coming into the
> City. Primarily, however, it has the effect of expelling those already present and
> of significantly burdening their freedom of movement within the City and the
> state. For example, a homeless person who is forced to sleep in public must keep
> moving within the city or leave it altogether to avoid being arrested.

*Id.* at 1580-81.

At least one case besides *Pottinger* has found the Fourteenth Amendment right to travel

to be implicated by a City's policy and practice of removing homeless persons from downtown

areas. In *Johnson v. Board of Police Commissioners*, 351 F.Supp.2d 929 (E.D.Mo. 2004), the

district court granted a preliminary injunction motion, finding that plaintiffs had established a

likelihood of success on the merits of their right to travel claims where many plaintiffs had been

arrested while eating, sitting, or standing in public places downtown; one plaintiff had been

physically removed from downtown by police and abandoned north of the area; and several

plaintiffs claimed they had been told that they were not wanted in and should stay away from

downtown. *Id.* at 949. While the specific claims in this case are different, the application of the right to travel to a policy and practice allegedly targeting homeless people for punishment and removal is similar.

**III.    Fourteenth Amendment Equal Protection Claim**

Defendants' attack on Plaintiffs' Equal Protection claim is premature, as every single one of the cases relied upon were decided on the basis of some sort of factual record, whether on summary judgment motions, review of summary judgment decisions, preliminary injunction motions, review of preliminary injunction decisions, or after trial. Plaintiffs have not alleged that they were discriminated against on the basis of poverty (however, it should be noted that "a poor person has the same expectation of constitutional protection as a rich person," *Johnson v. Board of Police Commissioners*, 351 F.Supp.2d at 935). Rather, Plaintiffs have adequately stated a claim that Defendants acted with an intent or purpose to discriminate based upon their membership in a specific class of homeless persons, and Plaintiffs have defined those actions with adequate specificity at this stage. *See* Complaint, ¶¶ 34-39, 41, 51.

Plaintiffs dispute that the class they have defined and seek to represent is not a suspect class for equal protection analysis, in that Plaintiffs have alleged the violation of their fundamental rights. However, even if this Court declines to follow *Pottinger*'s suggestion that homelessness may be a suspect classification and applies a lower standard of review, until a record is at least partially developed in this case, there is no evidence properly before this Court of any rational basis for Defendants' actions. Defendants' claims in their motion that the City of Portland has legitimate interests in aesthetics, sanitation, public health and safety are unsupported and should be disregarded for the purpose of a motion to dismiss. Moreover, some courts are reluctant to recognize the legitimacy of an interest in "aesthetics" in this context: "We

should hesitate to accord great weight to 'a perceived public interest in avoiding the aesthetic discomfort of being reminded on a daily basis that many of our fellow citizens are forced to live in abject and degrading poverty.'" *Roulette v. City of Seattle*, 97 F.3d 300, 309 (9th Cir. 1996) (Pregerson, J., dissenting) (citing *Streetwatch v. National R.R. Passenger Corp.*, 875 F.Supp. 1055, 1066 (S.D.N.Y. 1995), ruling that Amtrak could not continue to eject people from Pennsylvania Station in New York City simply because they are homeless or appear homeless).

Similarly, even if the Court gave some weight to Defendants' allegations about sanitation, public health and safety, Defendants have not shown how prohibiting homeless people from sleeping anywhere on public property at all hours enhances sanitation, health or safety, or that there are no more limited ways to enhance them. The concern about sanitation seems to refer to the lack of toilet facilities for those sleeping outside; *see, e.g., Joel*, 232 F.3d at 1358-59. But enforcing the ordinances against involuntarily homeless people does not encourage them to find toilets, as they still have nowhere else to go. As for safety, it is not safe for people to be moved from street to street, or forced into hiding so they can avoid arrest. Indeed, given Plaintiffs' allegations that Defendants have punished and will continue to punish homeless individuals for committing no crime except being outside with survival gear, and that these actions pose a dangerous health and safety risk to Plaintiffs and the class, and, as a result, to the general public, this Court could find that Defendants' policies and practices as applied to these individuals do not survive a lower standard of review, even possibly rational basis. *See* Complaint, ¶ 37-38.

## IV. Liberty Interest And Due Process Under The Fourteenth Amendment

Plaintiffs' claim that their liberty interest secured by the Fourteenth Amendment's Due Process Clause has been violated is, in some ways, a recasting of their rights to travel and

freedom of movement claims. Both the Second and Fourth Claims rely on the same difficult to

define, but undeniably fundamental, right to exist in a public place for innocent purposes.

"Freedom of movement is basic in our scheme of values." *Kent v. Dulles, supra*, 357 U.S. at 125

(analyzing constitutionality of a regulation that denied passports); *see also Johnson v. City of*

*Cincinnati*, 119 F.Supp.2d 735, 744-47 (S.D.Ohio 2000) (finding that municipal drug exclusion

zones violate plaintiffs' right to freedom of movement because "it turns conduct that was

otherwise legal -- being in [a neighborhood] – into criminal trespass"), and *Yeakle v. City of*

*Portland*, 322 F.Supp.2d 1119, 1127 (D.Or. 2004) (holding in the First Amendment context that

"[t]he ability to be *physically present* in quintessential public forums is necessary to engaging in

free speech in those forums" (emphasis in original)). There is no inherent inconsistency in

claiming that the sweeping prohibition against "camping," applied in a way that effectively

precludes a person from sleeping, infringes both the right to be in one place and the right to

travel to and from that place.

This is not the claim made in *Roulette* that an ordinance preventing sidewalk obstruction

at certain hours and in certain locations is unconstitutional. It relies on the facts that Defendants'

actions have left Plaintiffs with no other choice but to break the law if they wish to live in

Portland. In an effort to avoid acknowledging the fundamental nature of Plaintiffs' claim,

Defendants' motion re-labels it variously as a "right to live or stay wherever they want to," a

right to "make accommodations available...that reflect their desires," a "right to camp where they

like when they like," and "a right to camp or erect some type of structure in the public place or

public right-of-way of their choosing." Those are not the rights Plaintiffs seek to enforce. The

facts alleged here are entirely different from those in *Turner v. Hallberg*, 2005 U.S. Dist. LEXIS

37184 *1-2 (D.Or. 2005), a case brought by a homeowner against a City of Portland building

inspector whom she alleged had first targeted her home for nonexistent code violations and then bought the house after it had been foreclosed upon, later selling it for a profit. The right to travel claim apparently was unsupported by any evidence and received little analysis by Judge King in granting summary judgment on the claim. *Id.* at *18-20.

## V.    Justiciable Controversy Or Political Question

Defendants' argument that this case would require the Court to dictate policy to the City, assume executive or legislative authority, or resolve an issue without judicially discoverable and manageable standards is without any basis in the facts or legal claims Plaintiffs allege. While the City of Portland does engage in political decisions about how to allocate resources concerning homelessness, that fact does not mean that this case presents a nonjusticiable political question. *Baker v. Carr*, 369 U.S. 186 (1962), which sets forth the characteristics of political question cases, holds that "the courts cannot reject as 'no law suit' a bona fide controversy as to whether some action denominated 'political' exceeds constitutional authority," and further clarifies that "it is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States, which gives rise to the 'political question.'" *Id.* at 217-18.

Many courts have considered and resolved the types of substantive claims raised by Plaintiffs in this case, both supporting and disfavoring these claims; *see, e.g., Jones, Joel, Joyce, Tobe, Roulette, Pottinger, Johnson, supra.* It is not only feasible; it is the precise function of federal courts to decide the question of whether municipal ordinances and their enforcement violate the fundamental civil rights of individuals against whom the ordinances are enforced.

Plaintiffs do not ask this Court to encroach upon the City of Portland's responsibility to make social policy or control the use of its public spaces, nor need this Court do so in order to

find constitutional violations. Plaintiffs' Complaint asks for injunctive relief to end

unconstitutional policies and practices; this is very different from asking the Court to dictate all

of Portland's policies with regard to homelessness. Relief in this case could take many forms,

and by enjoining unconstitutional punishment, this Court does not need to require "that

[Portland] adopt any particular social policy, plan or law to care for the homeless." *Jones*, 444

F.3d at 1138. Nor does this Court need to require that Portland allow all individuals to camp or

store belongings anywhere on public property at any time. As in Los Angeles, Plaintiffs here

allege that they can prove that they "are entitled at a minimum to a narrowly tailored injunction

against the City's enforcement of [the relevant ordinances] at certain times and/or places." *Id.*

Plaintiffs now ask for the opportunity to present facts in support of their claims.

## CONCLUSION

For the reasons argued above, Plaintiffs' Complaint should not be dismissed.


Dated this 30th day of March, 2009.


Respectfully submitted,


OREGON LAW CENTER


/s/ Monica Goracke
Monica Goracke, OSB #06065
(503) 473-8312
Of Attorneys For Plaintiffs