IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MARLIN ANDERSON, MARY BAILEY,                    Civ. No. 08-1447-AA
MATTHEW CHASE, JACK GOLDEN,
LEO RHODES, and JERRY BAKER,                     OPINION AND ORDER
on behalf of themselves and
all others similarly situated,

           Plaintiffs,

     v.

CITY OF PORTLAND; CITY OF
PORTLAND POLICE CHIEF MICHAEL
REESE, in his individual and
official capacity; CITY OF
PORTLAND POLICE OFFICER J.
HURLEY, in his individual and
official capacity; CITY OF
PORTLAND POLICE OFFICER J.
FULITANO, in his individual
and official capacity; CITY
OF PORTLAND POLICE OFFICERS
DOES 1 THROUGH 50,

           Defendants.
_____

Monica Goracke
Ed Johnson
Spencer M. Neal
Oregon Law Center
921 S.W. Washington #516
Portland, OR  97205
     Attorneys for plaintiffs


1    - OPINION AND ORDER

David A. Landrum
Deputy City Attorney
Office of City Attorney
1221 S.W. Fourth Ave., Room 430
Portland, OR  97204
    Attorney for defendants

AIKEN, Chief Judge:

Plaintiffs seek summary judgment and class certification in this action filed against defendants pursuant to 42 U.S.C. § 1983. Defendants oppose plaintiffs' motions, arguing that genuine issues of material fact preclude summary judgment, and that plaintiffs fail to show class certification is appropriate.  Two individual defendants, police officers Hurley and Fulitano, move for summary judgment on qualified immunity grounds.  Plaintiffs concede that they are entitled to qualified immunity, and the motion for partial summary judgment as to these individual defendants is granted. Plaintiffs' motions are denied.

## BACKGROUND

Under the Portland City Code (PCC), it is unlawful "for any person to camp in or upon any public property or public right of way," unless otherwise authorized by the Code or the mayor in emergency circumstances.  PCC § 14A.50.020(B).  The Code defines "to camp" as "to set up, or to remain in or at a campsite, for the purpose of establishing or maintaining a temporary place to live." Id. § 14A.50.020(A)(1).  "Campsite" is defined as "any place where any bedding, sleeping bag, or other sleeping matter, or any stove or fire is placed, established, or maintained, whether or not such

2   - OPINION AND ORDER

place incorporates the use of any tent, lean-to, shack, or any other structure . . . ." Id. § 14A.50.020(A)(2). A conviction for violating § 14A.50.020 is punishable by a fine up to $100 and thirty days imprisonment. Id. § 14A.50.020(C).

Similarly, PCC § 14A.50.050 renders it unlawful "to erect, install, place, leave, or set up any type of permanent or temporary fixture or structure of any material(s) in or upon non-park public property or public right-of-way without a permit or other authorization from the City." Any such fixture or structure is deemed a "public nuisance," and "[i]n addition to other remedies provided by law," may be "summarily" abated by the police. Id. 14A.50.050(B). Violation of the temporary structure ordinance is punishable by a fine up to $500 and six months imprisonment, if permitted by Oregon law. PCC § 14A.20.060

The Portland Police Bureau Manual of Policy and Procedure sets forth directives when City police officers engage in a "posting" or "clean-up" of "established campsites." Goracke Decl. Ex. D. "Established campsites" are defined as "locations where a camp structure such as a hut, lean-to or tent is set up for the purpose of maintaining a temporary place to live and exists on public property." Ex. D at 3. "Camp clean-ups" are "any organized, prearranged operation by or on behalf of the Bureau to remove illegal campers, camps or camp structures from an established campsite." Ex. D at 3. Officers are directed to post a 24-hour

3   - OPINION AND ORDER

notice at the campsite prior to a camp clean-up and to notify JOIN (a local agency that provides services to homeless persons) of the pending clean-up.  Ex. D at 3.  Campsites that are on private property or a governmental right of way or that constitute a public health hazard or other emergency do not require twenty-four hours notice prior to clean-up.  Ex. D at 4.

Plaintiffs Marlin Anderson, Mary Bailey, Matthew Chase, Jack Golden, Leo Rhodes, and Jerry Baker reside in Portland, Oregon, and all are involuntarily homeless.  Plaintiffs contend that Portland has far more homeless people than shelter spaces or available housing, and that many homeless people cannot access shelters based on their physical disabilities or mental illnesses.

Plaintiffs allege that, pursuant to the camping and temporary structure ordinances, City police officers issue criminal citations to homeless persons sleeping on public property, seize homeless persons' property without providing twenty-four hours' notice, and fail to notify social service agencies prior to and after clean-ups.  Plaintiffs also allege that officers enforce the ordinances in a manner that prohibits sleeping on public property, including parks, at all times of the day and night.  In addition to potential criminal sanctions, plaintiffs claim that they may be excluded from public parks in Portland for up to 180 days for violating the ordinances.    Plaintiffs allege that police officers use such exclusions, in combination with camping and temporary structure

4    - OPINION AND ORDER

citations, to remove homeless people from public parks.

Plaintiffs allege that defendants' enforcement of the ordinances, in conjunction with other policies and practices, violates homeless individuals' rights to be free from cruel and unusual punishment under the Eighth Amendment and to equal protection under the Fourteenth Amendment of the United States Constitution.

## DISCUSSION

### A. Cruel and Unusual Punishment

Plaintiffs allege that defendants' enforcement of the camping and temporary structure ordinances essentially criminalizes the status of homelessness in violation of the Eighth Amendment. See Ingraham v. Wright, 430 U.S. 651, 667 (1977) (Eighth Amendment "imposes substantive limits on what can be made criminal and punished as such"); Robinson v. California, 370 U.S. 660, 667 (1962). Plaintiffs maintain that defendants' enforcement of the challenged ordinances criminalizes conduct – sleeping in public – that is inexplicably intertwined with their "involuntary condition" of homelessness. See Jones v. City of Los Angeles, 444 F.3d 1118, 1132 (9th Cir. 2006), vacated by 505 F.3d 1006 (9th Cir. 2007); Pottinger v. City of Miami, 810 F. Supp. 1551, 1564 (S.D. Fla. 1992).[1]

---

[1]Jones involved a similar challenge brought by homeless persons in Los Angeles and was vacated by the Ninth Circuit after the parties reached settlement. Jones, 505 F.3d 1006.

5  - OPINION AND ORDER

In a previous order denying defendants' motion to dismiss, I declined to find that the Eighth Amendment limitation on criminalizing "mere status" depended solely on whether the challenged law or its enforcement targets "involuntary" conduct that is derivative of status. Rather, I found that resolution of plaintiffs' Eighth Amendment claim requires consideration of the nature of the prohibited conduct and whether and to what degree defendants' enforcement of the camping and temporary structure ordinances criminalizes "conduct that society has an interest in preventing." Opinion and Order at 15-16 (July 30, 2009); see also Powell v. Texas, 392 U.S. 514, 532 (1968) (approving criminal sanctions "for public behavior which may create substantial health and safety hazards . . . and which offends the moral and esthetic sensibilities of a large segment of the community").

Despite the court's guidance regarding this claim, plaintiffs do not submit evidence of the specific manner in which the ordinances are enforced or the specific conduct which led to the enforcement actions. Rather, plaintiffs rely on their declarations generally describing various instances in which they were subjected to warnings, citations, and convictions for sleeping on public property. See generally Baker Decl.; Golden Decl.; Rhodes Decl. Even though plaintiffs present evidence that they were subjected to some type of enforcement under the ordinances, they do not present undisputed evidence of the specific conduct that was prohibited.

6   - OPINION AND ORDER

Plaintiffs further rely on a summary description of citations that were issued between 2006 and 2010. During this time period, 124 citations were issued for unlawful camping and 331 were issued for erecting a temporary structure. Plaintiffs maintain that only five camping citations were issued to non-homeless people (or whose housing status was undetermined) and only eight temporary structure citations were issued to non-homeless people. Goracke Decl. Ex. E. Plaintiffs maintain that these and other City records document the numbers of homeless people living in Portland and the lack of available shelter space, and that enforcement of the two ordinances is aimed almost exclusively at homeless individuals throughout the City. See Goracke Decl. ¶ 8 and Exs. A-C, E.

Defendants offer a different interpretation of the summary of citations. Defendants contend that the evidence shows that City police officers issued camping citations to only ninety unique individuals identified as homeless between January 2006 and September 2010 and issued temporary structure citations to only 138 unique individuals identified as homeless between January 2006 and September 2010. Defs.'s Exs. 1B, 3. Using a January 2009 estimate of 1,591 unduplicated persons sleeping outside, defendants maintain that police cited 5.66% of identified homeless persons for unlawful camping and 8.67% of such persons for erecting a temporary structure during that time period. Defs.'s Exs. 1B, 3.

Defendants argue that the relatively low number of citations

7    - OPINION AND ORDER

issued for violations of the ordinances, and their repeated
issuance to the same persons, undermines plaintiffs' argument that
putative class members are not given notice or an opportunity to
comply with either the ordinances or police directives. Defendants
also emphasize that the majority of unlawful camping citations were
issued between 6:00 a.m. and 10:00 a.m., thus supporting the
inference that the City employs an informal practice of allowing
homeless people to sleep in public places during conventional
sleeping hours. Defs.'s Exs. 1C, 4. Defendants also point to the
City's efforts to provide housing and other services for homeless
persons.   See Erickson Aff. and attached exhibits.   Finally,
defendants emphasize that enforcement of the ordinances is driven
by legitimate government interests of public safety and sanitation.

Plaintiffs acknowledge that the City spends $13 million
annually on a variety of homeless programs, and that a small
percentage of the identified homeless population has received
citations for violating the two ordinances at issue. Plaintiffs
further agree that relatively more citations are given between 6:00
a.m. and 10:00 a.m. and that the City does not have a formal policy
to relocate or drive all homeless people out of the City. Finally,
plaintiff concede that the actual manner of enforcement varies and
that not all conduct being punished is innocent or involuntary.
However, plaintiffs maintain that these facts do not preclude
summary judgment.

8   - OPINION AND ORDER

I disagree. Given the legitimate governmental interests of safety and sanitation cited by defendants and the differing interpretations that result from the summary of citations and the manner of their enforcement, plaintiffs do not establish, as a matter of law, that defendants' enforcement actions criminalize status as opposed to conduct in violation of the Eighth Amendment. Accordingly, plaintiffs' motion is denied on this claim.

## B. Equal Protection

Plaintiffs next move for summary judgment on their equal protection claim, arguing that defendants' enforcement of the ordinances is enforced selectively against the homeless, and that defendants intentionally target the homeless population and treat them differently from non-homeless persons through their enforcement actions.

Where a plaintiff alleges selective enforcement of criminal laws, the "plaintiff must demonstrate that enforcement had a discriminatory effect and the police were motivated by a discriminatory purpose," and that "the police misconduct is part of a 'policy, plan, or a pervasive pattern.'" Rosenbaum v. City and Cnty. of San Francisco, 484 F.3d 1142, 1152-53 (9th Cir. 2007) (quoting Thomas v. Cnty. of Los Angeles, 978 F.2d 504, 509 (9th Cir. 1993)). Notably, "the availability of such a claim has never been limited only to those groups accorded heightened scrutiny under equal protection jurisprudence." Stemler v. City of

9    - OPINION AND ORDER

Florence, 126 F.3d 856, 874 (6th Cir. 1997). "Instead, a plaintiff
makes out a selective-enforcement claim if she shows that the state
based its enforcement decision on an 'arbitrary classification,'
that . . . gives rise to an inference that the state 'intended to
accomplish some forbidden aim' against that group through selective
application of the laws." Id. (quoting Oyler v. Boles, 368 U.S.
448, 456 (1962) and Futernick v. Sumpter Twp., 78 F.3d 1051, 1056
(6th Cir. 1996)).

Plaintiffs claim that the enforcement data shows that
defendants have targeted homeless individuals for simply being
outside in public places with gear necessary for their survival.
However, plaintiffs fail to present or cite specific evidence to
support these assertions. Instead, plaintiffs rely on the citation
summary showing that homeless persons constitute the majority of
persons cited under the camping and temporary structure ordinances.
Plaintiffs further emphasize that citations are not issued to non-
homeless persons camping on City streets and sidewalks the night
before the Rose Parade or annual sales events, or near sports
stadiums and concert venues such as the Rose Quarter, Jeld-Wen
Field, and Roseland. Plaintiffs assert that in the few instances
in which enforcement occurred against a non-homeless person, such
as a business owner or employee, the action taken by defendants was
strikingly less punitive and less severe than that taken against
homeless people. Plaintiffs thus argue that they sufficiently

10  - OPINION AND ORDER

extrapolate evidence of a selective enforcement policy from the enforcement data.  See Hoye v. City of Oakland, 653 F.3d 835, 855 (9th Cir. 2011) ("Often, the only way to establish whether such a policy exists is to extrapolate from enforcement data, in many cases a formidable task.").

Defendants again contend that they have legitimate safety and sanitation concerns, and that the ordinances are enforced to ensure consistent access to rights of way as well as the safety of all persons.  For example, defendants maintain that in every instance where an a homeless individual was cited under the temporary structures ordinance, the structure was erected on a public right of way and obstructed the use of a sidewalk or street by other members of the public.  Defs.'s Ex. 1C, 1E.

Defendants further maintain that the lack of citations for events such as the Rose Parade does not unequivocally establish a policy or practice to target homeless people, that enforcement of the ordinances at issue is confined to homeless persons, or that non-homeless persons are exempt from enforcement.  To illustrate, defendants emphasize that no citations were issued to anyone for violating the ordinances in 2006, 2007, 2008, 2009, or 2010 during the days and evenings leading up to the Rose Parade.  Defs.'s Ex. 2.

Finally, defendants argue that plaintiffs offer no undisputed evidence showing that non-homeless persons are allowed to sleep

11   - OPINION AND ORDER

outdoors or erect temporary structures on public property with impunity. As emphasized during oral argument, defendants present evidence that camping and temporary structures citations were issued to non-homeless persons in 2007, 2008, 2009 and 2010. See Defs.'s Ex. 2.

I agree with defendants that the evidence, at minimum, reflects genuine issues of material fact regarding the selective enforcement of the ordinances and the intent of the City and the Police Bureau. The fact that the majority of citations are issued to homeless persons may suggest a discriminatory effect of enforcement, but it does not necessarily establish a discriminatory purpose of the part of defendants. Therefore, plaintiffs' motion for summary judgment is denied with respect to their Equal Protection claim.

## B. Motion to Certify Class

Plaintiffs also move to certify the following class under Federal Rule of Civil Procedure 23:

[A]ll persons who (a) are, or will be homeless in that they are, or will be, without fixed nighttime shelter because they lack the financial resources or have other problems that prevent them from being able to provide for their own food, shelter and other essentials; (b) reside within the City of Portland; and (c) were cited or excluded, or will be cited or excluded, under the City ordinances applied to the class pursuant to the City policies, practices or customs of enforcement challenged by this action.

A court may certify a class if a plaintiff demonstrates that all of the prerequisites of Rule 23(a) have been met, and that at

12  - OPINION AND ORDER

least one of the requirements of Rule 23(b) have been met. See Fed. R. Civ. P. 23; Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir. 1996). Rule 23(a) imposes four requirements:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Generally, I find that plaintiffs meet the first, third and fourth elements. Given the numbers of homeless persons in Portland and the number who have been cited and the difficulty in joining them all, the numerosity requirement likely is met. Further, plaintiffs' claims are typical of the class, in that they assert defendants' enforcement actions criminalize homelessness and discriminates against them for being homeless. Finally, I find no reason that plaintiffs cannot adequately and fairly represent the interests of the class, given their continued appearance and participation as plaintiffs since the case was filed and their counsel's experience and expertise.

However, I do not find common questions of fact that meet the second element, given the breadth of the proposed class. Plaintiffs identify putative class members as those who are or will

13 - OPINION AND ORDER

be homeless and cited under the ordinances "pursuant to the City policies, practices or customs of enforcement challenged by this action." As a practical matter, the fact that future, as yet unidentified persons are included in the proposed class raises an issue as to how such persons will be identified or given notice. Moreover, the proposed class does not define what precise "policies, practices, or customs of enforcement" class members must be subjected to in order to fit within the class definition, given the breadth of enforcement actions that are challenged.

Plaintiffs themselves admit that police officers have enforced the ordinances in different ways in response to varying actions:

> Some homeless individuals' actions seems to be affected by substance addiction or mental illness. Some homeless individuals are rude or threatening toward Police Officers. Some individuals' conduct before or after they are contacted by Police Officers results in their being charged with additional crimes. Some homeless individuals block the sidewalk and/or create a mess while sleeping with their belongings, drawing complaints from other citizens and businesses. Some individuals are given multiple opportunities to comply with the law before being cited; others are given multiple citations. Many Officers seem to give citations only after an individual has not voluntarily complied with a warning or order to move. Some Police Officers inform individuals that shelters or other forms of emergency assistance are available to them.

See Goracke Decl. ¶ 8.

Thus, plaintiffs fail to present facts that are common to all members of the proposed class. For example, plaintiffs do not limit the proposed class to those who were cited for merely sleeping in public with a bedroll or bedding, or to those whose

14 - OPINION AND ORDER

property was confiscated without warning or notice. See Lehr v. City of Sacramento, 259 F.R.D. 479, 481-84 (E.D. Cal. 2009) (court allowed class certification of homeless persons who alleged that police officers confiscated their property without notice or hearing when enforcing a no-camping ordinance); Kincaid v. City of Fresno, 244 F.R.D. 597, 602 (E.D. Cal. 2007) ("[C]ommon questions of fact and law arise from Defendants' alleged destruction of Plaintiffs' personal property without notice pursuant to the duly adopted and regularly established practice of the City.").

While plaintiffs' legal claims alleging constitutional violations are typical of one another, plaintiffs here do not allege a common pattern of conduct or enforcement. Thus, I cannot find that plaintiffs' proposed class meets the commonality requirement of Rule 23(a)(2).[2]

Plaintiffs also must meet at least one requirement of 23(b).

_____

[2]Defendants also argue that plaintiffs must establish facts to support the merits of their claims in order to obtain class certification. See Wal-Mart v. Dukes, 131 S. Ct. 2541, 2551 (2011) ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule - that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact . . . [and] frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiffs' underlying claim."). Defendants contend that plaintiffs cannot show by a preponderance that police officers selectively enforce the ordinances or are motivated by a discriminatory City policy when doing so, the standard of proof that defendants argue was set forth in Wal-Mart. I do not necessarily agree with defendants' interpretation that Wal-Mart requires plaintiffs to prove their claims to a certain degree before certification. Regardless, given the lack of commonality, I need not address this issue.

15   - OPINION AND ORDER

Plaintiffs initially sought certification pursuant to Rule 23(b)(2). However, plaintiffs agree that because they seek damages as well as injunctive relief, certification must be sought under Rule 23(b)(3), which requires: "[T]hat the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The predominance inquiry tests "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623 (1997) (citation omitted). For the same reasons discussed above with respect to the element of commonality, I find that plaintiffs fail to meet the predominance inquiry of Rule 23(b)(3). Given the various fact patterns relevant to putative class members, and in particular, the various methods of enforcement actions taken by police officers when enforcing the camping and temporary structure ordinances, it is difficult to find that common question of law or fact predominate over individual issues. Thus, certification of the class as proposed by plaintiffs is denied.

## CONCLUSION

Defendants' Motion for Partial Summary Judgment (doc. 57) is GRANTED in favor of individual defendants Hurley and Fulitano. For the reasons stated above, plaintiffs' motions for summary judgment

16  - OPINION AND ORDER

and to certify class (doc. 47, 64) are DENIED. As noted during oral argument, this case cries out for a political solution rather than a legal one, and the court strongly urges the decision makers in this case to consider realistic and practical measures to resolve plaintiffs' claims.

IT IS SO ORDERED.

Dated this day of December, 2011.

Ann Aiken
United States District Judge

17    - OPINION AND ORDER